# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CYNTHIA DENICE MCINTIRE,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:22-cv-00159-MHH** |
| | } | |
| | } | |
| **MARTIN O'MALLEY,** | } | |
| **Commissioner of the Social Security** | } | |
| **Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Cynthia McIntire, who is proceeding *pro se*, has asked the Court to review a final adverse decision of the Commissioner of Social Security.[2]  The Commissioner of Social Security denied Ms. McIntire's claims for disability and supplemental security income based on the Appeals Council's decision finding that Ms. McIntire

---

[1]  On December 20, 2023, Martin O'Malley was sworn in as Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner O'Malley as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

[2]  Throughout the administrative process, Ms. McIntire was represented by counsel.  (Doc. 7-5, pp. 3-4, 31, 83, 93-96, 98-99; Doc. 7-7, pp. 49-50, 77-78).  The Court denied Ms. McIntire's request to appoint counsel to represent her in this appeal.  (Docs. 2, 4).

was not disabled.[3]  In her complaint, Ms. McIntire asserts that substantial evidence does not support the Appeals Council's decision, particularly regarding its finding that she had the residual functional capacity to perform light work and could stand and/or walk for a total of six hours in an eight-hour workday.  (Doc. 1, p. 3).[4] Because Ms. McIntire is proceeding *pro se*, and the Court construes her complaint liberally.  *See Curtis v. Comm'r of Soc. Sec.*, 856 Fed. Appx. 276, 276 (11th Cir. 2021) (applying the liberal construction rule to a *pro se* Social Security appeal). After careful review of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. McIntire had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if [she] is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period

---

[3]  Where, as here, the Appeals Council grants review and renders a decision, the Appeals Council's decision is the Commissioner's final decision for purposes of this Court's review.  *See* 20 C.F.R. §§ 404.900(a)(4)-(5), 404.981, 422.210.

[4]  Ms. McIntire did not have to file a brief in support of her challenge to the Appeals Council's decision.  The briefing notice in this matter states:  "Unless the plaintiff is proceeding without counsel, initial briefs will be required of all parties."  (Doc. 8, p. 1).  Because Ms. McIntire did not file a brief, the Court relies on her complaint to understand her position in this appeal.

of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[5]

To determine whether a claimant has proven that she is disabled, an administrative law judge—an ALJ—follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).  At the fifth step, "the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

---

[5]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited Aug. 11, 2024).

On March 11, 2020, Ms. McIntire applied for a period of disability, disability insurance benefits, and supplemental security income.  (Doc. 7-6, pp. 3, 13, 17, 22, 37).[6]  Initially, Ms. McIntire alleged that her disability began on September 2, 2016.  (Doc. 7-6, p. 13).  The Commissioner initially denied Ms. McIntire's claims, and Ms. McIntire requested a hearing before an ALJ.  (Doc. 7-5, pp. 5, 13, 20, 23, 26, 30).  Ms. McIntire and her attorney attended a hearing on February 22, 2021 via telephone conference.  (Doc. 7-5, p. 57).  At the hearing, Ms. McIntire amended the alleged onset date from September 2, 2016 to January 21, 2020.  (Doc. 7-3, pp. 54-55).  A vocational expert testified via telephone during the hearing.  (Doc. 7-3, pp. 78-92).

The ALJ issued an unfavorable decision on April 5, 2021.  (Doc. 7-3, pp. 27-38).  On October 27, 2021, the Appeals Council granted Ms. McIntire's request for review and found that the ALJ's decision contained "an error of law."  (Doc. 7-5, p. 109).  Nevertheless, the Appeals Council found that Ms. McIntire was not disabled between her alleged onset date of January 21, 2020 and April 5, 2021, the date of the ALJ's decision.  (Doc. 7-5, pp. 110, 112).  The Appeals Council explained that the ALJ improperly considered listings 1.02 and 1.04, which had been deleted three

---

[6]  Ms. McIntire previously filed an application for Social Security disability benefits, and an ALJ denied the application on July 30, 2019.  (Doc. 7-4, pp. 5-17).  The Court did not find evidence in the record that Ms. McIntire requested Appeals Council review of that decision or appealed the decision to the district court.

days before the ALJ's decision, rather than listings 1.15, 1.16, and 1.18 in revised Section 1.00 concerning musculoskeletal conditions. (Doc. 7-5, pp. 100-111). The Appeals Council also explained that it did not agree with some of the ALJ's findings at step four regarding Ms. McIntire's past relevant work. (Doc. 7-5, p. 111). Nevertheless, the Appeals Council found that Ms. McIntire was "capable of returning to [her] past relevant work." (Doc. 7-5, p. 112).

The Appeals Council gave Ms. McIntire 30 days to submit a "statement about the facts and law in [the] case or additional evidence" and to ask for an "appearance before the Appeals Council" before it rendered its final decision. (Doc. 7-5, p. 113). The Appeals Council did not receive from Ms. McIntire a statement or additional evidence. (Doc. 7-3, pp. 5-6).

On December 7, 2021, the Appeals Council issued an unfavorable decision, (Doc. 7-3, pp. 5-9), making the Commissioner's decision a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also* 20 C.F.R. §§ 404.900(a)(4-5), 404.981, 422.210.

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. McIntire's Medical Records*

To support her application for disability and supplemental security income, Ms. McIntire relied on medical records relating to the treatment and diagnoses of degenerative disc disease, osteoarthritis of the lumbar spine with radiculopathy,

annular disc tear, right trigger thumb, obesity, high cholesterol, gastroesophageal reflux disease, anxiety, and depression.[7]   The Court has reviewed Ms. McIntire's complete medical history and summarizes the following medical records because they are most relevant to the Court's decision in this appeal.

---

[7]  Radiculopathy "describes a range of symptoms produced by the pinching of a nerve root in the spinal column. . . .  Radiculopathy is typically caused by changes in the tissues surrounding the nerve roots.  These tissues include bones of the spinal vertebrae, tendons[,] and intervertebral discs.  When these tissues shift or change in size, they may narrow the spaces where the nerve roots travel inside the spine or exit the spine; these openings are called foramina.  The narrowing of foramina is known as foraminal stenosis, which is very similar to spinal stenosis that affects the spinal cord. . . .  One common cause of foraminal stenosis and radiculopathy is a bulging or herniated disc."  *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Aug. 11, 2024).

"When radiculopathy occurs in the lower back, it is known as lumbar radiculopathy, also referred to as sciatica because nerve roots that make up the sciatic nerve are often involved.  The lower back is the area most frequently affected by radiculopathy."  Symptoms of radiculopathy include "sharp pain in the back, arms, legs, or shoulders that may worsen with certain activities" and weakness in the arms or legs.   *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Aug. 11, 2024).

"An annular fissure or tear" in a disc is a "deficiency of one or more layers of the annulus fibrosus" surrounding a disc.  Most annular fissures are asymptomatic, but some may be painful.  Typically, simple symptomatic annular fissures without disc herniation are treated with non-steroidal anti-inflammatory medications and low-impact physical therapy.  Chronic pain due to annular fissures can be due to granulation tissue or in-growth of nerve endings which is usually seen near the dorsal root ganglion.  Additionally, an annular fissure can allow extrusion, for example, disc herniation, of the nucleus pulposus and compress the adjacent nerves."   *See* https://www.ncbi.nlm.nih.gov/books/NBK459235/ (last visited on Aug. 11, 2024).

A trigger thumb occurs when the lining of the flexor tendons in the thumb cannot glide without friction through thick, soft tissue covering the tendons and lining, referred to as the pulleys.  The friction "makes it difficult for the tendon to move back and forth."  The pain caused by a trigger thumb may occur with pressure over the pulley area and may be "only present with activity such as gripping."  "When at rest, [the trigger thumb] may not hurt.  Over time, if there is increased fluid production in the tendon sheath, this may cause pressure and pain even without hand use."  A trigger thumb may cause swelling, stiffness, loss of motion, popping, catching, or locking of the thumb.  As the "tendon and pulley interaction becomes tighter, the pain can increase."   *See* https://www.assh.org/handcare/condition/trigger-finger (last visited Aug. 11, 2024).

*Physical Impairments*

In June 2015, Ms. McIntire injured her back when she pulled on a "feeder bowl at work and felt a pop in her back." (Doc. 7-11, p. 47).  Afterwards, Ms. McIntire complained of "chronic unremitting back pain."  (Doc. 7-11, p. 47).  A July 2015 MRI showed that Ms. McIntire had "loss of disc signal" at L5-S1 and "slight loss of disc signal" and height at L2-3 and L3-4; a "[s]mall left lateral disc bulge with mild mass effect" but no foraminal stenosis at L3-4; and "[m]inimal facet joint hypertrophy" but no canal or foraminal stenosis at L5-S1.  (Doc. 7-9, p. 89).[8]

Ms. McIntire began pain management with Dr. Michael Cosgrove at The Orthopaedic Center in January 2016.  (Doc. 7-11, p. 69).  Ms. McIntire reported severe "stabbing pain with numbness that worsen[ed] while standing or sitting for long periods of time."  (Doc. 7-11, p. 69).  Over the course of 2016, Ms. McIntire saw either Dr. Cosgrove or nurse practitioner Cynthia Wall monthly, and Ms. McIntire returned to work in September 2016.  (Doc. 7-11, pp. 18-72).

---

[8] "Facet hypertrophy is a common condition that occurs when the facet joints in the spine become enlarged. The facet joints are synovial joints in the spine where two vertebrae come into contact. They help to stabilize the spine during bending and twisting motions. . . . .  Spondylosis, or degeneration of the spine, is the most common cause of facet joint disease. . . .  Facet joint hypertrophy is a chronic, painful disease that progresses with age. . . .  It may be described as worse in the morning or after periods of inactivity.  Pain may be worse with rotation or extension of the spine, and palpation of the facet joints often results in pain.  Pain may also radiate to the buttocks, groin, and thighs."  *See* https://www.rheumatologyadvisor.com/ddi/facet-hypertrophy/ (last visited Aug. 11, 2024).

In February and March 2016, Dr. Cosgrove opined that Ms. McIntire could perform light duty work, could not lift more than 20 pounds, could not stand for a "prolonged" period, and had push and pull limitations. (Doc. 7-11, pp. 61, 64). In April 2016, Ms. McIntire informed Dr. Cosgrove that her job had changed, and she could work while seated with her "feet touching the floor," which "helped her pain." (Doc. 7-11, p. 58). She told Dr. Cosgrove that she wanted to "proceed with facet injections" for her pain because she wanted "to do whatever she [could] to stop taking pain medications." (Doc. 7-11, p. 58).

Per a May 2016 functional evaluation that Dr. Brian Carter performed, Ms. McIntire occasionally could lift 10 pounds "floor to knuckle," "knuckle to shoulder," and "shoulder to overhead"; occasionally could carry a 15-pound-box 30 feet; and constantly could sit and stand, frequently bend and squat, and occasionally kneel and climb stairs. (Doc. 7-11, p. 52). Ms. McIntire had "very limited range of motion," tenderness to light touch, and back and leg pain with a straight leg raise test. (Doc. 7-11, p. 51). Dr. Carter found that Ms. McIntire had mild lumbar spondylosis, "axial mechanical back pain, "non-verifiable radicular complaints," and a "5% whole person impairment" that included "some minor impairment related to significant guarding and muscle spasm[s]." (Doc. 7-11, p. 52). Dr. Carter noted that "[o]ther than medication management," Ms. McIntire was "approaching maximum medical improvement." (Doc. 7-11, p. 49). Dr. Carter limited Ms. McIntire to sedentary

work.  (Doc. 7-11, p. 52).  A "Blankenship System Reliability Profile" showed that Ms. McIntire had "some limitations by very strong pain in the low back, posterior hips, and down the back of both legs to the ankles," but she "exhibited mild symptom or disability exaggeration by testing criteria."  (Doc. 7-11, p. 52).  Ms. McIntire passed 25 of 35 validity criteria for the functional evaluation, which suggested "fair effort and conservative results."  (Doc. 7-11, p. 52).

In May 2016, Ms. McIntire saw Dr. Brian Scholl at The Orthopaedic Center. (Doc. 7-11, p. 54).  Dr. Scholl reviewed Ms. McIntire's July 2015 MRI and noted that it did not show "significant stenosis at any level" but did show "mild foraminal stenosis . . . at L3."  (Doc. 7-11, p. 54).  Dr. Scholl examined Ms. McIntire and found that she had "pain with axial rotation," a normal gait and station, 5/5 motor strength, and "no straight leg raising."  (Doc. 7-11, p. 54).  Dr. Scholl concluded that Ms. McIntire had "chronic back pain" and chronic "arthritic changes" in her lumbar spine.  (Doc. 7-11, pp. 54-55).  Dr. Scholl indicated that he did "not see anything that [he could] address from a surgical standpoint."  (Doc. 7-11, p. 55).  He advised Ms. McIntire to lose weight and decrease her body mass index, (Doc. 7-11, p. 56).[9]

---

[9]  The records from the May 2016 visit reflect that Ms. McIntire weighed 150 pounds, was 5 feet and 4 inches tall, and had a body mass index of 25.74.  (Doc. 7-11, p. 55).  For Ms. McIntire's height, a weight range of 107.8-145.1 pounds would produce a normal body mass index.  *See* https://www.medicalnewstoday.com/articles/323446#body-mass-index-bmi (last visited February 18, 2024).

In September 2016, Ms. McIntire reported to Dr. Cosgrove that she had another functional capacity evaluation and had returned to work at normal status; she had worked for one week. She complained that her pain was worse because of her increased work level. (Doc. 7-11, p. 30). Dr. Cosgrove found that Ms. McIntire's lower extremity strength "was less than expected," and he noted that Ms. McIntire made "some painful sounds on strength testing." (Doc. 7-11, p. 31).

In October 2016, NP Wall noted that Ms. McIntire had had an MRI the previous month and that Dr. Raymond Armstrong, who reviewed the MRI, found desiccation with posterior disc bulging at L5-S1, mild narrowing of the bilateral neural foramina and lateral recesses, and minimal effacement of the central canal. (Doc. 7-11, p. 25). NP Wall indicated that Ms. McIntire's complaints of radiating leg pain "correlate[d] with the abnormalities seen on the MRI" and was "likely dermatomal distribution." (Doc. 7-11, p. 25).[10] NP Wall recommended an epidural steroid injection, but Ms. McIntire "was not ready to proceed with any injections."

---

[10] "Dermatomes are areas of skin that are connected to a single spinal nerve. . . . Spinal nerves help to relay information from other parts of your body to your central nervous system. As such, each dermatome transmits sensory details from a particular area of skin back to your brain. Dermatomes can be helpful in evaluating and diagnosing conditions affecting the spine or nerve roots. Experiencing symptoms along a specific dermatome can help inform doctors about which area of the spine may be affected." Pain that occurs along a "specific dermatome may indicate a problem with a specific nerve root in the spine." If a nerve root is affected in the L5-S1 part of the lumbar spine, you would expect to have pain in the "lower back, front and outside of calf, top and bottom of foot, [and] first four toes" for L5 and in the "lower back, back of thigh, back and inside of calf, [and] last toe" for S1. *See* https://www.healthline.com/health/dermatome#dermatomes-chart (last visited Aug. 11, 2024).

(Doc. 7-11, p. 25).  By November 2016, Ms. McIntire had completed physical therapy "without significant benefit" and wanted to proceed with an epidural steroid injection because of her pain.  (Doc. 7-11, p. 22).  NP Wall again noted that Ms. McIntire had "pain in the L5-S1 dermatome that correlate[d] with her lumbar MRI." (Doc. 7-11, p. 23).

In December 2016, NP Wall noted that Ms. McIntire rated her pain at 9/10. Ms. McIntire received a steroid injection on December 13, 2016.  (Doc. 7-11, pp. 16, 18).

In January 2017, Ms. McIntire reported that the December 2016 epidural steroid injection did not relieve her pain.  She continued to complain of "stabbing, aching, and numbness across the lumbosacral junction that radiate[d] down both legs posteriorly to the ankle," and she rated her pain at 8/10.  (Doc. 7-11, pp. 15-16).  In February 2017, Ms. McIntire still rated her pain at 8/10 and took Norco, ibuprofen, and a muscle relaxer for pain.  (Doc. 7-11, pp. 12, 14).  Per the 2019 ALJ opinion from Ms. McIntire's first disability application, an April 2017 discogram "was positive at the L5-S1 level."  (Doc. 7-4, p. 11; Doc. 7-9, p. 47).[11]  The Court has not found the records from the 2017 discogram in the current administrative record nor

[11] A discogram is a "test to determine if back . . . pain is being caused by a weakened, damaged[,] or displaced dis[c]. . . . This procedure works by attempting to cause a pain similar to [the pain] you experience regularly.  Each suspect dis[c] is tested in turn.  If the test duplicates your usual pain, the dis[c] under examination is considered to be the source of the problem."  *See* https://www.cedars-sinai.org/programs/imaging-center/exams/interventional-neuroradiology/discogram/information.html (last visited February 8, 2024).

has the Court found other records from 2017 in the current administrative record, but it appears that Ms. McIntire continued to receive treatment from Dr. Cosgrove in 2017. (*See* Doc. 7-9, p. 48, referring to a March 3, 2017 appointment that Ms. McIntire had with Dr. Cosgrove). It also appears that she began receiving treatment at Tennessee Valley Pain Consultants in February 2017. (Doc. 7-9, p. 49).

Ms. McIntire received treatment from Tennessee Valley Pain Consultants in March 2018. (Doc. 7-9, p. 53). In May 2018, Ms. McIntire reported that physical therapy made her pain worse and that she used a cane to walk. (Doc. 7-4, p. 12).[12] Ms. McIntire was seen at Tennessee Valley Pain Consultants in September 2018. (Doc. 7-9, p. 52).

On October 2, 2018, at the direction of her workers' compensation provider, Ms. McIntire saw Dr. Thomas Kraus and his nurse practitioner Barbara Dulaney at Tennessee Valley Pain Consultants for pain management. (Doc 7-9, pp. 47-48). Ms. McIntire rated her pain at 7/10 at the visit, and she complained of pain "across [her] lower back radiating into [her] bilateral posterior legs to just past [her] knee." (Doc. 7-9, p. 47). Dr. Kraus diagnosed lumbar spondylosis. (Doc. 7-9, p. 47).

Ms. McIntire saw Dr. Kraus, CRNP Dulaney, and CRNP Jane Walker on October 30, 2018. (Doc. 7-9, pp. 47, 53). Ms. McIntire rated her pain at 8/10 on a

---

[12] The 2019 ALJ opinion included this information. (Doc. 7-4, p. 12). The Court cannot find the 2018 physical therapy records in the current administrative record.

"good day," and at 10/10 on a "bad day."  (Doc. 7-9, p. 48).  She stated that her pain was worse in her lower left leg, that activity made her pain worse, that rest helped her pain, and that Norco helped her pain "about 70% of the time."  (Doc. 7-9, p. 53).  Ms. McIntire reported that she could walk around her house, do light grocery shopping, and perform her activities of daily living "without much difficulty or assistance due to the oral pain meds providing relief."  (Doc. 7-9, p. 52).  Ms. McIntire used a cane to walk, and her gait was "unsteady."  (Doc. 7-9, pp. 48-49, 57).

Dr. Kraus noted that Ms. McIntire "underwent 2-3 back procedures" with no pain relief.  (Doc. 7-9, pp. 48, 51).  Ms. McIntire had abnormal spinal tenderness upon palpation and limited range of motion on extension and flexion at L4-L5; abnormal squatting; a positive lying and sitting straight leg raise test on the left side in the "back only"; abnormal left toe and heel walking; bilateral lumbar spasms; and decreased strength in both legs.  (Doc. 7-9, pp. 56-57).  Dr. Kraus found that Ms. McIntire had a "herniated lumbar dis[c] with radiculopathy," an annular disc tear, lumbar disc disease, and chronic pain.   (Doc. 7-9, pp. 55-56).   Dr. Kraus recommended an epidural block for pain, but Ms. McIntire declined.  (Doc. 7-9, p. 54).  Dr. Kraus continued Ms. McIntire's Norco prescription.  (Doc. 7-9, p. 51).

During November and December 2018 visits with CRNP Dulaney, Ms. McIntire complained of lower back pain that radiated to both legs, and Ms. McIntire

rated her pain at 8/10.  (Doc. 7-9, pp. 25, 37).  Ms. McIntire reported that activity, bending, standing, and walking aggravated her pain; rest and medication helped her pain.  (Doc. 7-9, p. 37).  During the November 2018 visit, CRNP Dulaney noted that Ms. McIntire had an unsteady gait, walked with a cane, had lumbar spine and joint tenderness, and decreased range of motion in her lumbar spine.  (Doc. 7-9, pp. 37, 41, 44-45).  Ms. McIntire took 10 mg of Norco four times a day.  (Doc. 7-9, p. 39).  CRNP Dulaney noted that Ms. McIntire had an antalgic gait at the December 2018 visit but did not indicate whether Ms. McIntire used a cane.  (Doc. 7-9, p. 33).

When Ms. McIntire visited TVPC in January, February, and March 2019, she complained of burning and stabbing lower back pain that radiated to her legs, and she rated her pain at 7/10 to 8/10 with pain medication.  (Doc. 7-8, pp. 170-71, 176, 188-89; Doc. 7-9, pp. 8-9, 13).  Ms. McIntire reported that her pain medication helped 50 to 75 percent of the time and was "effective pain control."  (Doc. 7-8, pp. 175-76, 192; Doc. 7-9, pp. 2, 13).  For these visits, CRNP Dulaney noted that Ms. McIntire had an unsteady gait and used a cane.  (Doc. 7-8, pp. 172, 182, 189-90; Doc. 7-9, pp. 10, 17).  CRNP Dulaney examined Ms. McIntire and found lumbar spine tenderness and decreased range of motion.  (Doc. 7-8, pp. 181-82; Doc. 7-9, p. 17).  During an April 2019 visit, Ms. McIntire complained of back pain that she rated at 8/10.  CRNP Dulaney noted that Ms. McIntire ambulated independently. (Doc. 7-8, pp. 158-59, 167-68).

In May 2019, Ms. McIntire returned to CRNP Dulaney and complained of lower back and right leg pain that she rated at 4/10. (Doc. 7-8, pp. 144, 150). Ms. McIntire reported that her pain was worse during the day and that moving, standing, and driving aggravated her pain. (Doc. 7-8, p. 150). Ms. McIntire stated that her pain was better when she sat or reclined and that her pain medications made her pain tolerable 50 to 60 percent of the time. (Doc. 7-8, p. 150). CRNP Dulaney noted that Ms. McIntire had a steady gait and "ambulate[d] independently." (Doc. 7-8, p. 146). CRNP Dulaney examined Ms. McIntire and found that Ms. McIntire had bilateral lumbar muscle spasms, decreased strength in her right leg, abnormal tenderness in her spine at L4-L5, a positive sitting straight leg raise test on the left side, decreased range of motion, and abnormal toe and heel walking on the right side. (Doc. 7-8, pp. 155-56). CRNP Dulaney advised Ms. McIntire to exercise daily and encouraged her to walk 40 minutes five days per week. (Doc. 7-8, p. 151).

During her June 2019 visit, Ms. McIntire complained of back pain radiating into her right leg. Ms. McIntire rated the pain at 7/10 and reported that her medication helped about 50% of the time. CRNP Dulaney examined Ms. McIntire and found that Ms. McIntire had an antalgic gait, bilateral lumbar muscle spasms, lumbar spine tenderness, deceased strength in her right leg, and full range of motion in all joints in her extremities. (Doc. 7-8, pp. 132, 137, 140). Ms. McIntire reported in July 2019 that she was "stable" on her pain medication and rated her pain at 8/10.

(Doc. 7-8, pp. 119, 125).  CRNP Dulaney noted that Ms. McIntire had an antalgic gait and lumbar spine pain and tenderness.  (Doc. 7-8, p. 128).  At an August 2019 visit, Ms. McIntire rated her back pain at 7/10, and CRNP Dulaney noted that Ms. McIntire used a cane to ambulate, had lumbar spine tenderness, and had moderately decreased range of motion in her back.  (Doc. 7-8, pp. 105, 114-15).  CRNP Dulaney informed Ms. McIntire that a "pain free state [was] not probable" and that she would have to tolerate a certain amount of pain.  (Doc. 7-8, p. 116).  CRNP Dulaney again recommended a home exercise program.  (Doc. 7-8, p. 117).

Ms. McIntire saw Dr. Kraus and CRNP Dulaney on September 3, 2019 and Dr. Kraus and NP Avis Brooks on September 27, 2019 and reported back and right leg pain that she rated at 8/10.  (Doc. 7-8, pp. 80, 91).  Ms. McIntire indicated that her pain medication reduced her pain by 50 to 60 percent and that "[b]lock therapy help[ed] about 75% of the time."  (Doc. 7-8, pp. 96-97).  At the September 27 visit, NP Brooks noted that Ms. McIntire walked with a cane and had moderately decreased range of motion in her back.  (Doc. 7-8, p. 88).

At visits with Dr. Kraus and CRNP Dulaney in October, November, and December 2019, Ms. McIntire continued to complain of lower back pain radiating to her right leg that she rated between 7/10 and 8/10.  (Doc. 7-8, pp. 43, 56, 68).  The notes from these visits indicate that Ms. McIntire had an antalgic gait but walked without a cane.  (Doc. 7-8, pp. 44, 57, 65, 69, 77).  Physical examinations showed

that Ms. McIntire had lumbar spine tenderness, pain, and decreased range of motion; Ms. McIntire reported that her pain medication was effective about 50 to 60 percent of the time, which allowed her to do her "ADLs and stay functional." (Doc. 7-8, pp. 49, 51, 64, 74, 76). At a December 2019 visit, CRNP Dulaney noted that Ms. McIntire had passed all her Norco pill counts; CRNP Dulaney did "not suspect any diversion or misuse of medication." (Doc. 7-8, p. 49).

Ms. McIntire returned to TVPC on January 21, 2020 and complained of lower back pain that radiated to her right leg that she rated at 7/10. (Doc. 7-8, p. 30). Ms. McIntire reported that her pain was tolerable about 50 to 60 percent of the time depending on her activities and that pain medication helped 70 percent of the time. (Doc. 7-8, p. 36). CRNP Dulaney observed that Ms. McIntire had an antalgic gait but ambulated independently. (Doc. 7-8, pp. 32, 39). The physical examination showed that Ms. McIntire had lumbar spine pain and tenderness, joint tenderness, and decreased range of motion. (Doc. 7-8, p. 39). Ms. McIntire's drug screening was negative for the metabolites found in Norco. (Doc. 7-8, pp. 36-37). Ms. McIntire's drug screen from January 21, 2020 detected hydrocodone. (Doc. 7-8, pp. 28-29).

Ms. McIntire saw Dr. Ronald Calhoun at North Jackson Primary Care on January 23, 2020 and complained of pain in her right thumb. (Doc. 7-9, p. 65). Ms.

McIntire had decreased range of motion and tenderness in her right thumb.  (Doc. 7-9, p. 65).  Dr. Calhoun prescribed Mobic, an anti-inflammatory.  (Doc. 7-9, p. 65).

On February 28, 2020, Ms. McIntire saw Dr. Kraus and complained of aching lower back pain that radiated into her right leg, and she rated her pain at 7/10.  (Doc. 7-8, p. 18).  Dr. Kraus noted that Ms. McIntire ambulated independently.  He did not physically examine Ms. McIntire at this visit.  (Doc. 7-8, p. 19).  At a March 17, 2020 visit with Dr. Kraus, Ms. McIntire reported that she had "dull aching spasms with some burning" in her lower back and rated her pain at 7/10.  (Doc. 7-8, p. 12).  Ms. McIntire reported that her pain medication reduced her pain 60 percent, that she was able to function because she took the pain medication, and that she took her pain medications as prescribed and had not run out.  (Doc. 7-8, p. 11).  Dr. Kraus noted that Ms. McIntire ambulated independently, and his examination showed that she had joint tenderness and decreased range of motion.  (Doc. 7-8, pp. 8, 13).  NP Dulaney noted that Ms. McIntire had two negative "oral screen[s]" for the metabolites found in Norco, so that she (CRNP Dulaney) no longer could prescribe opiates for Ms. McIntire.  (Doc. 7-8, p. 12).  CRNP Dulaney gave Ms. McIntire a "weaning dose" of the pain medication.  (Doc. 7-8, p. 12).

On April 6, 2020, Ms. McIntire consulted Dr. Calhoun for pain management.  Ms. McIntire indicated that her functional goal was to "walk a further distance" and improve her ability to dress, groom, and cook.  (Doc. 7-9, p. 64).  Dr. Calhoun noted

that Ms. McIntire had 5/5 strength in both legs, had a negative straight leg raise test, and weighed 188 pounds.  (Doc. 7-9, p. 64).  Dr. Calhoun indicated that Ms. McIntire should continue Norco but stop taking Xanax and that he needed to get her pain management records.  (Doc. 7-9, p. 64).  On May 4, 2020, Ms. McIntire reported that she had adequate pain relief and was meeting her functional goals.  (Doc. 7-9, p. 63).  Dr. Calhoun continued Ms. McIntire on Norco.  (Doc. 7-9, p. 63).

At Dr. Calhoun's request, on May 29, 2020, Ms. McIntire saw Dr. Masoud Hamidian for a consultation regarding Ms. McIntire's right thumb pain.  (Doc. 7-9, p. 92).  Ms. McIntire described the pain as sharp and constant and rated it at 10/10.  (Doc. 7-9, p. 92).   An x-ray of Ms. McIntire's cervical spine showed mild degenerative disc disease; a right-hand x-ray was normal.  (Doc. 7-9, p. 93).  When Dr. Hamidian examined Ms. McIntire, he found tenderness and triggering in her right fingers; normal range of motion, strength, tone, and stability in her cervical, thoracic and lumbar spine; and a normal gait and station.  (Doc. 7-9, p. 93).  Dr. Hamidian diagnosed Ms. McIntire as having a right trigger thumb and "right arm numbness" that could be carpal tunnel syndrome.  (Doc. 7-9, p. 94).  Dr. Hamidian discussed a surgery option; noted that if the numbness did not improve, he would order a nerve conduction test; and prescribed Celebrex.  (Doc. 7-9, p. 94).  Dr. Hamidan recommended home exercise.  (Doc. 7-9, p. 94).  Ms. McIntire indicated

that she would think about surgery and let Dr. Hamidan know if she decided to proceed.  (Doc. 7-9, p. 94).

At monthly appointments with Dr. Calhoun from June to December 2020, Ms. McIntire reported that her chronic back pain was stable, that she had no new problems, that she had no decline in function, and that she was meeting her functional goals.  (Doc. 7-9, pp. 98-102; Doc. 7-11, pp. 5-7, 84, 87).  Dr. Calhoun counseled Ms. McIntire on diet and exercise for her obesity; she weighed 180 pounds at the June 2020 visit.  (Doc. 7-11, p. 102).  June and December 2020 drug screens showed that Ms. McIntire was positive for Norco, and Dr. Calhoun continued Ms. McIntire's Norco prescription.  (Doc. 7-9, pp. 98-102; Doc. 7-11, pp. 5-7, 84, 87-89).  At a January 2021 appointment, Ms. McIntire reported that she was "alright," her chronic pain was stable, and she had "adequate pain relief."  (Doc. 7-11, p. 92).  Dr. Calhoun noted that Ms. McIntire had improved activities of daily living and was meeting her functional goals.  (Doc. 7-11, p. 92).  Dr. Calhoun continued Ms. McIntire on Norco.  (Doc. 7-11, p. 92).

*Mental Impairments*

In September 2018, Ms. McIntire sought treatment for anxiety and depression and reported that she wanted to get back on medication.  (Doc. 7-9, p. 72).  Dr. Calhoun prescribed Xanax and Prozac.  (Doc. 7-9, p. 72).  In December 2018, Ms. McIntire reported that she was "alright," slept adequately, and had no decline in

function.  (Doc. 7-9, p. 71).  CRNP Dulaney noted during a February 2019 visit that Ms. McIntire's anxiety was controlled with Xanax.  (Doc. 7-9, p. 5).  Ms. McIntire reported to Dr. Calhoun in February, May, and August 2019 that she was doing "alright" and "ok," that she had no new problems, and that she had no decrease in her ability to function.  (Doc. 7-9, pp. 68-70).  At a September 2019 visit, Dr. Calhoun noted that Ms. McIntire had been on Xanax since March 2017, that she was taking both Xanax and Norco, and that a psychologist should evaluate Ms. McIntire's need to take both medications.  (Doc. 7-9, p. 67).  Dr. Calhoun noted in October 2019 that he was awaiting Ms. McIntire's psychological evaluation, and he continued Ms. McIntire's Xanax prescription.  (Doc. 7-9, p. 66).  CRNP Dulaney's notes from November and December 2019 and January and February 2020 indicated that Dr. Calhoun was weaning Ms. McIntire from Xanax and that she was doing well with the process.  (Doc. 7-8, pp. 24, 36, 49 62).

At a January 23, 2020 visit, Dr. Calhoun noted that Ms. McIntire's anxiety was stable, and he continued her Xanax prescription.  (Doc. 7-9, p. 104).  Dr. Calhoun noted on April 6, 2020 that he would stop Ms. McIntire's Xanax prescription; he prescribed only Prozac for her anxiety at a May 2020 visit.  (Doc. 7-9, p. 103).  Ms. McIntire reported that her anxiety was stable in June 2020.  Dr. Calhoun did not note Ms. McIntire's anxiety or Prozac prescription at the monthly

visits from July 2020 through January 2021.  (Doc. 7-9, p. 98; Doc. 7-11, pp. 5-7, 84, 87, 92).

### *Consultative Opinions*

*Dr. Gloria Sellman's and Dr. Krishna Reddy's Administrative Physical Assessments*

On June 26, 2020, at the request of the Social Security Administration, Dr. Sellman reviewed Ms. McIntire's medical records and assessed her physical residual functional capacity.  (Doc. 7-4, p. 30).  Dr. Sellman noted that Ms. McIntire's degenerative disc disease, "coupled with arthritic changes in the lumbar and cervical spine and [right] hand trigger thumb, would be expected to produce significant pain." (Doc. 7-4, p. 30).  Dr. Sellman recounted February, April, and May 2020 findings that Ms. McIntire had no joint deformities, good range of motion, a normal gait, and 5/5 muscle strength in her extremities.  (Doc. 7-4, p. 30).  Dr. Sellman noted that Ms. McIntire told doctors that she could walk around her house, did light grocery shopping, and performed activities of daily living with minimal assistance.  (Doc. 7-4, p. 30).  Consequently, Dr. Sellman found that Ms. McIntire's statements "about the limiting affect for [her] condition appear[ed] to be only partially credible." (Doc. 7-4, p. 30).

Dr. Sellman opined that Ms. McIntire occasionally could lift and carry 20 pounds; frequently lift and carry 10 pounds; and stand, walk, and sit with normal breaks for "6 hours in an 8-hour workday."  (Doc. 7-4, p. 31).  Dr. Sellman also

found that Ms. McIntire had no limitations in pushing, pulling, balancing, stooping, kneeling, crouching, and reaching overhead; frequently could climb ramps and stairs, but never climb ladders, ropes, or scaffolds; frequently could crawl; and should avoid concentrated exposure to extreme cold and vibrations, hazards, unprotected heights, and hazardous moving parts.  (Doc. 7-3, pp. 31-33).   Dr. Sellman noted that Ms. McIntire was right-hand dominant and opined that Ms. McIntire occasionally could grasp, turn, lift, carry, push, pull, guide, pinch, hold, support, manipulate, and hold down small objects with her right hand; had no limitations in her ability to reach overhead; and had no fingering and feeling limitations.  (Doc. 7-3, p. 32).[13]  Based on these findings, Dr. Sellman concluded that Ms. McIntire could perform light, semi-skilled work as a school bus monitor, chaperone, or usher, jobs that existed in significant numbers in the national economy.  (Doc. 7-3, pp. 34-35).

At the request of the Social Security Administration, on August 27, 2020, Dr. Krishna Reddy reviewed Ms. McIntire's medical record.  (Doc. 7-4, pp. 54-58).  Dr. Reddy agreed with Dr. Sellman's residual functional capacity assessment and opined that Ms. McIntire could perform light work doing the jobs that Dr. Sellman listed. (Doc. 7-4, p. 57).

---

[13] Dr. Sellman wrote that there was a "plan surgical repair 'trigger thumb.'"  (Doc. 7-4, p. 32).

*Dr. Robert Estock's and Dr. Leslie N. Rodrigues's Administrative*
*Mental Assessments*

On June 26, 2020, at the request of the Social Security Administration, psychiatrist Dr. Estock reviewed Ms. McIntire's medical records and assessed her mental residual capacity. (Doc. 7-4, p. 29). Dr. Estock found that Ms. McIntire had no limitations in her ability to understand, remember, or apply information; interact with others; and adapt or manage herself. (Doc. 7-4, p. 29). He found that Ms. McIntire had mild limitations in her ability to concentrate, persist, or maintain pace. (Doc. 7-4, p. 29). Dr. Estock noted that Ms. McIntire reported to doctors that she could perform her activities of daily living with minimal assistance, had no cognitive issues, and got along with others. (Doc. 7-4, p. 29). Dr. Estock opined that Ms. McIntire had a mental impairment but that her "alleged level of severity [was] not supported by the evidence in the file." (Doc. 7-4, p. 29). Dr. Estock concluded that Ms. McIntire's anxiety was not a severe mental impairment. (Doc. 7-4, p. 29).

At the request of the Social Security Administration, on August 27, 2020, Dr. Leslie Rodrigues reviewed Ms. McIntire's medical records and agreed with Dr. Estock's assessment that Ms. McIntire's anxiety was not a severe impairment. (Doc. 7-4, p. 52).

## Ms. McIntire's Function Report and Hand Questionnaire

In June 2020, at the request of the Social Security Administration, Ms. McIntire completed a function report and a hand questionnaire. In her function

report, Ms. McIntire stated that she lived in her house alone and cared for her poodle. (Doc. 7-7, pp. 13-14). She stated that that from the time she woke up until she went to bed, she did "much of nothing" because of her back and hand pain. (Doc. 7-7, pp. 13, 20). She stated that her pain affected her sleep because she could not get comfortable. (Doc. 7-7, p. 14). Ms. McIntire indicated that each day, she would get up, go to the bathroom, lay down, get back up, get breakfast, lay down again, and then sit or stand because her back hurt "24/7" and her legs went numb. (Doc. 7-7, p. 13).

Ms. McIntire indicated that she had pain when she bent over to get dressed, used a shower chair, cared for her hair "one handed," and sat to shave. (Doc. 7-7, p. 14). Ms. McIntire stated that she prepared sandwiches and frozen dinners but could not cook big meals and drove a couple of times a week; her daughter cleaned the house for her. (Doc. 7-7, pp. 15-16). Ms. McIntire indicated that she shopped in stores two times a month for 30 minutes to get "quick frozen dinners." (Doc. 7-7, p. 16). She stated that she had no hobbies or interests, did not spend time with others, did not visit family, did not talk much to anyone, did not go to church or social events, and "just stayed home." (Doc. 7-7, pp. 17-18).

Ms. McIntire indicated that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use her hands. (Doc. 7-7, p. 18). She stated that she could not lift more than 10 pounds. (Doc. 7-7, p. 18). Ms.

McIntire indicated that she did not handle changes in routine well, handled stress as well as she could with her anxiety and depression, could pay attention as long as needed, and could follow written and spoken instructions and get along with authority figures "ok." (Doc. 7-7, pp. 18-19).

Ms. McIntire stated that she used a cane and walker that a doctor prescribed "around 2018." (Doc. 7-7, p. 19). She indicated that she used a walker when she walked a long distance and used a cane "all [the] time." (Doc. 7-7, p. 19). Ms. McIntire explained that she is right-handed. (Doc. 7-7, p. 18).

In her hand questionnaire, Ms. McIntire indicated that she had pain in her right hand when she fastened buttons and pulled her clothes up and down; that she used her left hand to shave and cut herself a lot; and that she needed help putting her hair in a ponytail. (Doc. 7-7, p. 24). She stated that she ate out because her hand pain affected her ability to cook, that her kids cleaned her house for her, and that she drove left-handed. (Doc. 7-7, p. 25). Ms. McIntire indicated that she could not grip or hold anything; dropped things; and could not grasp or turn a doorknob, write with a pen or pencil, or type with her right hand because of pain. (Doc. 7-7, p. 26). She stated that it was like her "right hand ha[d] been cut off." (Doc. 7-7, p. 26).

### *Administrative Hearing*

Ms. McIntire's administrative hearing took place on February 22, 2021 via telephone. (Doc. 7-3, pp. 46-93). Ms. McIntire stated that she had last worked in

2016.  (Doc. 7-3, p. 56).  Ms. McIntire testified that she could not work primarily because of her back pain and hand pain.  (Doc 7-3, p. 64).

Ms. McIntire testified that she had an angular disc tear and herniated lumbar disc that caused severe pain that she rated "between eight and nine on a regular basis."  (Doc. 7-3, pp. 64-65).  She stated that her pain went across her back and radiated into her right leg and sometimes her left leg.  (Doc. 7-3, p. 65).  She testified that bending over, squatting, reaching overhead, and twisting made her back pain worse.  (Doc. 7-3, p. 65).  Ms. McIntire stated that she could not pick up more than five pounds, could stand or walk for about ten minutes before she had to sit down and take a break, and could sit for about thirty to forty minutes before having to move around.  (Doc. 7-3, pp. 64-65).  Ms. McIntire testified that she was most comfortable lying down.  (Doc. 7-3, p. 66).

Ms. McIntire testified that Norco made her back pain "tolerable" and decreased her pain from 8-9/10 to around 6/10.  (Doc. 7-3, pp. 66-67).  Ms. McIntire testified that she did not wear a back brace but used a heating pad on her back.  (Doc. 7-3, p. 66).  Ms. McIntire testified that a surgeon in Birmingham told her that back surgery would cause her to "be out of commission for at least 12 to 16 weeks" and that she would "be in a lot of pain" for that time.  (Doc. 7-3, p. 74).  Ms. McIntire stated that she told the surgeon that she would rather "live with what pain [she had] now" instead of having pain for that time frame after surgery.  (Doc. 7-3, p. 74).

Regarding her hand pain, Ms. McIntire stated that she suffered from trigger thumb in both hands, though the issue began in her right hand.  (Doc. 7-3, pp. 66, 77).  Ms. McIntire testified that the pain in her left hand began late in 2020.  (Doc. 7-3, p. 77).  Ms. McIntire stated that she could not grab objects with her thumbs and had to use both hands to pick up a 20 oz Coke bottle because her thumbs could not grip it.  (Doc. 7-3, p. 66).  She testified that her thumbs would "lock" and shoot pain into her hands and arms.  (Doc. 7-3, p. 66).  Ms. McIntire stated that she had arthritis in her hands and that her hands hurt all the time.  (Doc. 7-3, p. 67).  She rated her hand pain at 6.5/10 after taking ibuprofen and Norco.  (Doc. 7-3, pp. 67-68).  Ms. McIntire indicated that she did not seek medical care for possible trigger thumb in her left hand because it would not "make any sense trying to come up with another $100 to pay the doctor to tell me the same thing [was] wrong with [her left thumb]." (Doc. 7-3, p. 77).  Ms. McIntire testified that a brace was not available to help relieve her trigger thumb pain and that she could not afford surgery to relieve the pain in her thumbs and hands.  (Doc. 7-3, p. 67).

Ms. McIntire testified that she suffered from anxiety and that various triggers caused her to "get real upset" and struggle to catch her breath.  (Doc. 7-3, p. 68). She stated that "anything that [was] upsetting," such as riding down a mountain, her mother passing away, and "life in general," triggered her anxiety.  (Doc 7-3, pp. 68-69).  Ms. McIntire testified that she also suffered from depression.  (Doc. 7-3, p. 69).

She stated that she "hate[d] being kind of secluded" because she could no longer walk down the road or "walk her grandkids in the stroller" and that she would not talk to anyone for "probably a week out of the month." (Doc. 7-3, p. 70).  Ms. McIntire indicated that she could not take Prozac for her depression because she had an allergic reaction to it.  (Doc. 7-3, p. 69).  She testified that doctors did not prescribe anything else for her depression because she did not "like taking a lot of medicine."  (Doc. 7-3, p. 71).  Ms. McIntire stated that initially she took Xanax for her anxiety, that she could not take both pain medication and Xanax, and that she "had to choose which one [she] needed the most," although she needed both.  (Doc. 7-3, pp. 69, 71).  She testified that she chose the pain medication, stopped taking Xanax, and opted to smoke "CBD oil" for anxiety, though no doctor prescribed it. (Doc. 7-3, pp. 71, 75-76).  Ms. McIntire indicated that CBD oil was not as effective as Xanax for controlling her anxiety. (Doc. 7-3, p. 71).  Ms. McIntire also testified that she had not been hospitalized and had not sought counseling for her mental health issues.  (Doc. 7-3, p. 75).

Regarding her daily activities, Ms. McIntire stated that her daughter helped twice a week with "laundry, sweeping, mopping, washing dishes," and other basic housekeeping.  (Doc. 7-3, p. 72).  Ms. McIntire testified that she could put clothes in the washer and that her husband fixed the dryer where she could "throw [the clothes] over to it[.]"  (Doc. 7-3, pp. 72-73).  She stated that she could not sweep,

mop, or wash dishes because she would have to stand too long.  (Doc. 7-3, p. 73).

Ms. McIntire indicated that she could shower on her own if she used a shower chair.

(Doc. 7-3, p. 72).  Ms. McIntire testified that she could shop for small things, but if

the order contained "big order stuff," then her daughter stopped for her.  (Doc. 7-3,

p. 73).  Ms. McIntire testified that she loved to swim and boat but could no longer

ride in a pontoon boat because "it bounce[d] over the waves" and caused discomfort.

(Doc. 7-3, p. 75).  Ms. McIntire testified that her daily exercise consisted of walking

around the house; at a store, she could not "walk that far without it hurting," so she

used an electric cart.  (Doc. 7-3, pp. 73-74).

The vocational expert who testified at the administrative hearing classified

Ms. McIntire's past work as a production assembler as light work but performed at

the heavy exertional level, as a cleaner/housekeeping as light work, as a cook as

medium work, as a cashier/counter clerk as light work, as an informal waitress as

light work, and as a medical assistant as light work.  (Doc. 7-3, pp. 79-81).  The ALJ

asked the VE to consider the work available to an individual the same age, education,

and work experience as Ms. McIntire, who could perform work with the following

limitations:  could lift, carry, push, and pull 20 pounds occasionally and 10 pounds

frequently; could stand, walk, and sit with normal breaks for a total of six hours in

an eight-hour work day; frequently could climb ramps and stairs but never climb

ladders, ropes, and scaffolds; frequently could crawl; occasionally could handle and

frequently could finger with the right upper extremity and was right-hand dominant; and should avoid concentrated exposure to extreme colds, vibrations, unprotected heights, and hazardous moving parts.  (Doc. 7-3, pp. 81-82).

The VE stated that an individual with those limitations could not perform Ms. McIntire's past work or any work, primarily because of the limitation of occasional handling with the dominant upper extremity.  (Doc. 7-3, p. 82).  The VE indicated that there were "some DOT titles that [were] returned" with those limitations, like jobs as a counter clerk, photo finisher, school crossing guard, school bus monitor, chaperone, and usher.  (Doc. 7-3, pp. 82-86).  Ms. Bennett testified that she did not think that an individual limited to occasional handling with the dominant hand could perform the counter clerk or photo finisher jobs.  (Doc. 7-3, pp. 83, 85).  She indicated that the school crossing guard and school bus monitor jobs were "seasonal" but did "meet the hypothetical."  (Doc. 7-3, p. 83).  The VE classified the job as a school bus monitor as light work, with 21,000 available jobs nationally; a chaperone as light work, with 3,800 available jobs nationally; and an usher as light work, with 4,500 available jobs nationally. (Doc. 7-3, pp. 84-86).[14]

In her second hypothetical, the ALJ asked the VE to assume the limitations in the first hypothetical, but the individual would be capable of frequent, rather than

_____

[14]  The VE did not testify regarding the classification or number of jobs available for the school crossing guard.  (*See* Doc. 7-3, p. 84).

occasional, handling with the right upper extremity. (Doc. 7-3, p. 86). The VE testified that the individual could not perform Ms. McIntire's past work as a fast-food cook and cashier/checker. (Doc. 7-3, p. 87). The VE indicated that the individual could perform Ms. McIntire's past work as a production assembler as generally performed but not as actually performed by Ms. McIntire, and the individual could work as a waitress, a medical assistant, and a housekeeper/cleaner as generally performed and as actually performed by Ms. McIntire. (Doc. 7-3, pp. 86-87). The VE testified the individual could perform light work as a photocopy machine operator, with 9,800 available jobs nationally; a marker, with 129,000 available jobs nationally; and a cashier II, with 569,000 available jobs nationally. (Doc. 7-3, p. 87).

In a third hypothetical, the ALJ asked the VE to assume the limitations in the first hypothetical, but the individual would be limited to sedentary work, could lift and carry 10 pounds occasionally and less than 10 pounds frequently, could stand and walk "2 hours in an 8-hour workday," and was limited to occasional handling with the dominant hand. (Doc. 7-3, pp. 87-88). The VE testified that the individual could not perform Ms. McIntire's past work but could perform sedentary work as an election clerk, with 6,700 available jobs nationally; a call-out operator, with 2,900 available jobs nationally; and a surveillance system monitor, with 8,400 available jobs nationally. (Doc. 7-3, pp. 88-89). The VE questioned whether an individual

limited to occasional handling with her dominant hand could work as an election clerk or a call-out operator because those jobs were clerical in nature.  (Doc. 7-3, pp. 88-89).

In a fourth hypothetical, the ALJ asked the VE to assume the same limitations as in the second hypothetical, but the individual was limited to sedentary work. (Doc. 7-3, p. 89).  The VE testified that the individual could not perform Ms. McIntire's past work but could work as an election clerk, call-out operator, and surveillance system monitor; a charge account clerk, with 900 available jobs nationally; an addresser, with 2,600 available jobs nationally; a document preparer, with 18,000 available jobs nationally; and a cable worker, with 1,000 available jobs nationally.  (Doc. 7-3, pp. 89-90).

Finally, the ALJ asked the VE whether adding the following limitations to the previous hypotheticals would affect the analysis:  the individual could understand, remember, and carry out short, simple instructions and tasks; could maintain attention and concentration for two-hour segments in an eight-hour workday; frequently could interact with coworkers, supervisors, and the public; and could adapt to frequent changes in the work setting.  (Doc. 7-3, p. 91).  The VE testified that those limitations would not change her previous responses but clarified that "the only two [past] occupations that would meet that hypothetical would be the production assembler and housekeeping, per the DOT."  (Doc. 7-3, p. 91).

## THE ALJ'S DECISION

The ALJ found that Ms. McIntire had not engaged in substantial gainful activity between her alleged onset date of January 21, 2020 and December 31, 2021, the date she was last insured.  (Doc. 7-3, p. 30).  The ALJ determined that Ms. McIntire suffered from the severe impairments of degenerative disc disease, osteoarthritis of the lumbar spine with lumbar radiculopathy, right trigger thumb, and obesity. (Doc. 7-3, p. 30).  The ALJ also determined that Ms. McIntire had the non-severe impairments of anxiety disorder and depression.  (Doc. 7-3, p. 30). Based on a review of the medical evidence, the ALJ concluded that, through the date she was last insured, Ms. McIntire did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 7-3, p. 32).

Considering Ms. McIntire's impairments, the ALJ evaluated Ms. McIntire's residual functional capacity.  (Doc. 7-3, p. 32).  The ALJ determined that Ms. McIntire had the RFC to perform:

> light work . . . except that she [could] lift and carry 20 pounds occasionally and 10 pounds frequently[;] [could] stand and/or walk, with normal breaks, for a total of 6 hours in an 8-hour workday; . . . [and could] sit, with normal breaks, for a total of 6 hours in an 8-hour workday.  Pushing and pulling limits [were] the same as for lifting and carrying.  [She could] climb ramps and stairs frequently; but she never [could] climb ladders, ropes[,] and scaffolds.  [She could] frequently crawl, and she [could] handle and finger frequently with the dominant right upper extremity. [She] should avoid concentrated exposure to

extreme cold and vibrations, and she should avoid all work with exposure to unprotected heights and hazardous moving parts.

(Doc. 7-3, p. 32).

Based on this RFC and relying on testimony from the vocational expert, the ALJ concluded that Ms. McIntire could perform her past relevant work as a waitress, "housekeeping cleaner," and medical assistant. (Doc. 7-3, p. 36). Relying on testimony from the vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Ms. McIntire could perform including photocopying machine operator, marker, and cashier II. (Doc. 7-3, pp. 37-38). Accordingly, the ALJ determined that Ms. McIntire was not disabled as defined by the Social Security Act. (Doc. 7-3, p. 38).

## THE APPEALS COUNCIL'S DECISION

The Appeals Council reviewed the ALJ's decision. The Appeals Council adopted the ALJ's findings at step one and two of the sequential process and agreed with the ALJ that Ms. McIntire had not engaged in substantial gainful activity since the alleged onset date and that Ms. McIntire suffered from the severe impairments of degenerative disc disease and osteoarthritis of the lumbar spine with lumbar radiculopathy, right trigger thumb, and obesity. (Doc. 7-3, p. 6). Applying the newly revised listings, the Appeals Council concluded that Ms. McIntire did not have an impairment or combination of impairments that met or medically equaled the

severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 6).

The Appeals Council adopted the ALJ's findings that Ms. McIntire's "statements concerning the intensity, persistence[,] and limiting effects of her symptoms were inconsistent with the objective medical evidence and other evidence in the record, as set forth in the [ALJ's] decision." (Doc. 7-3, p. 6). Considering Ms. McIntire's impairments, the Appeals Council evaluated Ms. McIntire's RFC and adopted the ALJ's RFC determination. (Doc. 7-3, p. 6). Based on this RFC, the Appeals Council concluded that Ms. McIntire could perform her past work as a housekeeping cleaner as generally and as actually performed and could perform her past work as a production assembler as generally performed. (Doc. 7-3, p. 7). The Appeals Council adopted the ALJ alternative finding that other jobs existed in significant numbers in the national economy that Ms. McIntire could perform, including a photocopy machine operator, marker, and cashier II. (Doc. 7-3, pp. 7-8). Accordingly, the Appeals Council determined that Ms. McIntire was not disabled as defined by the Social Security Act "from the alleged onset date of January 21, 2020 through April 5, 2021, the date of the hearing decision. . . ." (Doc. 7-3, p. 8).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  The Appeals Council decision is "reviewable as the final decision of the Commissioner of Social Security." *Solomon v. Comm'r, Soc. Sec. Admin.*, 532 Fed. Appx. 837, 839 (11th Cir. 2013) (quoting *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998)).  The Appeals Council's decision is "entitled to the same deference as the decision of the ALJ." *Parker v. Bowen*, 788 F.2d 1512, 1522 (11th Cir. 1986).

A district court must determine whether substantial evidence in the record supports the Appeal Council's factual findings.  *Parker*, 788 F.2d at 1517. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the Appeals Council. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the Appeal Council's decision is supported by substantial evidence, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r of Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the Appeal Council's legal conclusions, a district court must determine whether the Appeals Council applied the correct legal standards. If the court finds an error in the Appeal Council's application of the law, or if the court finds that the Appeals Council failed to provide sufficient reasoning to demonstrate that it conducted a proper legal analysis, then the district court must reverse the Appeals Council's decision. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Application of the Eleventh Circuit's Pain Standard*

Ms. McIntire contends that substantial evidence does not support the Appeals Council's RFC finding that she could stand and sit for six hours in an eight-hour workday. Here, the Appeals Council adopted the ALJ's pain standard findings. (Doc. 7-3, p. 6). So, the Court must evaluate whether substantial evidence supports the ALJ's pain standard analysis.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through [her] own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon pain to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and

(2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*).   If the ALJ does not properly apply the three-part standard, reversal is appropriate.   *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability."   *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that [s]he has a disability 'through h[er] own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).   If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.   The Commissioner must accept the claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony.   *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

In evaluating a claimant's symptoms, the provisions of Social Security Regulation 16-3p apply.   SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms
> differently and may be limited by symptoms to a greater or lesser extent
> than other individuals with the same medical impairments, the same
> objective medical evidence, and the same non-medical evidence. In
> considering the intensity, persistence, and limiting effects of an
> individual's symptoms, we examine the entire case record, including
> the objective medical evidence; an individual's statements about the
> intensity, persistence, and limiting effects of symptoms; statements and
> other information provided by medical sources and other persons; and
> any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4.  Concerning the ALJ's burden to explain the

reasons discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the
> individual's statements about his or her symptoms have been
> considered" or that "the statements about the individual's symptoms are
> (or are not) supported or consistent."  It is also not enough . . .  simply
> to recite the factors described in the regulations for evaluating
> symptoms.  The determination or decision must contain specific
> reasons for the weight given to the individual's symptoms, be
> consistent with and supported by the evidence, and be clearly
> articulated so the individual and any subsequent reviewer can assess
> how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.

In evaluating a claimant's reported symptoms, an ALJ must consider:

(i)   [the claimant's] daily activities;

(ii)  [t]he location, duration, frequency, and intensity of [the
claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv) [t]he type, dosage, effectiveness, and side effects of any
medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or
other symptoms;

(v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)   [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

In applying the pain standard, the ALJ found that Ms. McIntire's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 7-3, p. 35). In finding that Ms. McIntire's statements regarding the limitations caused by her pain were "inconsistent with the evidence," the ALJ explained:

> [Ms. McIntire] alleged in her adult function report that she use[d] a cane regularly and use[d] a walker when ambulating long distances. Dr. Kraus and CRNP Dulaney noted an antalgic gait throughout their treatment of [Ms. McIntire] but failed to document use of a cane after 09/27/2019 . . . . Instead, they noted that she ambulated independently and documented no deficits in motor tone, strength[,] or sensation. . . . In addition, there [was] no evidence that any provider prescribed an assistive device or indicated that one was medically necessary. [Ms. McIntire] alleged that she [could not] grasp or lift anything over five pounds due to bilateral trigger thumbs. Although there is

> documentation of right trigger thumb in the record . . . , there
> [was] no evidence in the record of complaints of or treatment for
> left hand pain or limitation.

(Doc. 7-3, p. 35).

As discussed, when an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The fact that Ms. McIntire's medical records do not reflect that she used a cane at every doctor's visit is not an adequate basis for discrediting her subjective statements regarding her inability to stand or sit for prolonged periods of time because of back pain.[15] The ALJ did not account for the fact that on days that they did not note Ms. McIntire's use of a cane, Dr. Kraus and CRNP Dulaney nevertheless found that Ms. McIntire had bilateral muscle spasms, tenderness, and decreased range of motion in her lumbar spine; decreased strength in her right leg; positive straight left leg raise test; and abnormal toe and heel walking on the right side. (Docs. 7-8, pp. 8, 13, 39, 49, 64, 76, 128, 140, 155-56). These objective findings are consistent with Ms. McIntire's reports about her pain and limitations. Additionally, Ms. McIntire's medical records reflect that she had herniated lumbar discs with

---

[15] The ALJ's factual finding is correct: for many visits in 2018 and 2019, Dr. Kraus and NP Dulaney noted that Ms. McIntire used a cane and had an unsteady, antalgic gait. (Doc. 7-8, pp. 88, 105-06, 114-15, 172, 182, 189-90; Doc. 7-9, pp. 10, 17, 37, 41, 44-45, 57). For many visits, neither Dr. Kraus nor NP Dulaney noted that Ms. McIntire used a cane. Though Dr. Kraus and NP Dulaney did not note Ms. McIntire's use of a cane at some visits between December 2018 and March 2020, Ms. McIntire routinely complained of severe back pain and had an antalgic gait. (Doc. 7-8, pp. 12, 30, 39, 43-44, 56-57, 65, 68-69, 77, 80, 91, 128, 132, 140, 158-59, 167-68; Doc. 7-9, pp. 33).

radiculopathy, an annular disc tear, and chronic pain. (Doc. 7-9, pp. 55-56). As early as 2016, Ms. McIntire's medical records state that her complaints of radiating leg pain "correlate[d] with the abnormalities seen on the MRI" and was "likely dermatomal distribution." (Doc. 7-11, p. 25).

Though the ALJ indicated that the record did not contain evidence that a doctor prescribed a cane, Ms. McIntire indicated in her 2020 function report that, around 2018, a doctor prescribed a cane. (Doc. 7-7, p. 19). The 2019 decision from Ms. McIntire's first disability application indicated that Ms. McIntire testified at an administrative hearing for that application that she stated using a cane in May 2017 and that a doctor prescribed a walker in December 2017. (Doc. 7-4, p. 10). The 2019 ALJ decision also stated that a medical provider's December 2017 note indicated that the provider would seek insurance approval for Ms. McIntire's request for a walker with a seat. (Doc. 7-4, pp. 10, 12). It is appropriate to infer from a medical provider's effort to obtain approval for a seated walker that the provider thought Ms. McIntire would benefit from a walker. At an October 2018 visit with CRNP Dulaney, Ms. McIntire reported that she used a cane at that visit because of "increase[d] numbness to [her] left leg." (Doc. 7-9, p. 53).

Because the February 2021 administrative hearing was via telephone, the ALJ could not observe whether Ms. McIntire used or needed a cane, and the ALJ did not ask Ms. McIntire questions during the hearing regarding her use of a cane.

"[Administrative] proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)).  When processing disability claims, ALJs "do not simply act as umpires calling balls and strikes.  They are by law investigators of the facts, and are tasked not only with the obligation to consider the reasons offered by both sides, but also with actively developing the record in the case."  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018).  To be sure, "claimants must establish that they are eligible for benefits," but an ALJ must "develop the record where appropriate . . . ."  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001)).  To the extent that the ALJ rested her pain analysis on the lack of evidence that Ms. McIntire used a cane after December 2019, the ALJ did not adequately explore the evidence regarding the assistive device before discrediting Ms. McIntire's reports of pain and limitations based on her intermittent use of a cane and the lack of evidence that a medical provider prescribed a cane.

More importantly, the ALJ focused on evidence that supported the finding that the objective evidence was not consistent with Ms. McIntire's pain reports – evidence like the fact that Ms. McIntire did not have documented deficits in motor tone, strength, or sensation, but the ALJ omitted discussion of evidence consistent

with her pain reports.  For example, the ALJ did not mention Dr. Kraus's diagnosis of herniated discs at L5-S1 with radiculopathy and annular disc tear.  *See Harris v. Astrue*, 4:08-cv-280-SPM/WCS, 2009 WL 11551740, *14 (N.D. Fla. April 27, 2009) (finding that the claimant's two small, herniated discs and annular tear in the lumbar spine standing alone satisfied the pain standard because those impairments could be reasonably expected to give rise to the claimed pain).  The ALJ did not mention Dr. Sellman's statement in her 2020 consultative opinion that Ms. McIntire's degenerative disc disease coupled with her other impairments would cause "significant pain."  (Doc. 7-4, p. 30).  The ALJ did not discuss NP Wall's 2016 medical note that Ms. McIntire's complaints of radiating leg pain were consistent with the objective findings in the 2016 MRI and followed the dermatome associated with the abnormalities at the L5-S1 level.  (Doc. 7-11, p. 25).  The ALJ did not address records from 2018 and 2019 reflecting muscle spasms, decreased range of motion in the lumbar spine, and abnormal toe and heel walking on the right side. (Docs. 7-8, pp. 8, 13, 39, 49, 64, 76, 128, 140, 155-56).  An ALJ may not cherry-pick evidence.  *See McCruter  v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was reached "by focusing upon one aspect of the evidence and ignoring other parts of the record");  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the

obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Although Dr. Kraus's and CRNP Dulaney's medical records noted the 2017 discogram, the results of the discogram are not in the administrative record. Presumably, the 2017 discogram showed that Ms. McIntire's herniated discs at L5-S1 were the source of her pain and supported her subjective reports of pain. (*See* Doc. 7-4, p. 11). The Court has not located in the administrative record evidence that the ALJ requested medical records regarding the 2017 discogram. Again, the ALJ had a duty to develop the record regarding this evidence that supported Ms. McIntire's subjective complaints of severe pain.[16]

Ms. McIntire reported to Dr. Calhoun in April 2020 that her functional goals were to "walk a further distance" and improve her ability to dress, groom, and cook. Doc. 7-9, p. 64). Ms. McIntire's reports in 2020 that she was meeting her functional goals, had no decline in function, and had no new problems did not mean that she did not continue to experience pain even on prescription pain medications. The ALJ pointed to the fact that Ms. McIntire had a normal posture, had a "full range of

---

[16]  The Court understands that the alleged onset date for Ms. McIntire's disability is January 2020. Still, the Appeals Council and ALJ relied on the MRI from 2016, and longitudinal records regarding Ms. McIntire's lumbar spine are relevant to Ms. McIntire's subjective complaints in 2020 regarding her pain and limitations.

motion of all joints," could walk around her house, could shop for groceries, and could perform her activities of daily living without much difficulty or assistance. (Doc. 7-3, p. 34). Ms. McIntire's ability to walk around her house is not inconsistent with her statement in her function report that she could walk about 100 feet before she needed to take a break, (Doc. 7-7, p. 18); her reports to Dr. Calhoun that her functional goal was to "walk a further distance," (Doc. 7-9, p. 64); or her testimony that she could walk about 10 minutes before she had to sit down and take a break, (Doc. 7-3, pp. 64-65).

Ms. McIntire consistently reported that increased activity aggravated her pain, that lying down helped alleviate her pain, and that prolonged sitting and standing aggravated her pain. (Doc. 7-3, p. 66; Doc. 7-8, pp. 36, 150; Doc. 7-9, pp. 37, 53; Doc. 7-11, pp. 24, 33, 39, 58). After Ms. McIntire returned to work full-time in 2016 and increased her activity, her pain increased too, and the 2016 MRI showed that her lumbar spine condition deteriorated. (Doc. 7-11, p. 30). Ms. McIntire testified that she could not sweep, mop, or wash dishes because she could not stand for long; that she had to use a shower chair because she could not stand for long; and that she could not walk very far in a store and used an electric cart. (Doc. 7-3, pp. 72-74). The ALJ did not discuss these precipitating and aggravating factors or the measures Ms. McIntire used to relieve her pain, including lying down and avoiding prolonged standing or sitting, as required by 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

With respect to Ms. McIntire's right trigger thumb pain, Ms. McIntire testified that her right thumb would "lock" and shot pain into her hands and arms.  She rated her pain at 7/10 after taking pain medication.  (Doc. 7-3, pp. 66-68).  The ALJ acknowledged that Dr. Hamidian recommended surgery for Ms. McIntire's right trigger thumb.  (Doc. 7-3, p. 34).  In discounting Dr. Seller's and Dr. Reddy's opinions that Ms. McIntire was limited to occasional handling with her right hand because of her right trigger thumb, the ALJ stated that "a limitation to occasional handling with the right upper extremity [was] inconsistent with a lack of treatment recommendations for trigger thumb other than a prescription for Celebrex and a discussion of surgical options."  (Doc. 7-3, p. 36).  Despite Dr. Sellman's and Dr. Reddy's opinions to the contrary, the ALJ found that Ms. McIntire frequently, instead of occasionally, could handle with her right hand.  The ALJ did not mention Ms. McIntire's testimony that she could not afford trigger thumb surgery.  (Doc. 7-3, p. 67).  Relatedly, Ms. McIntire testified that she began experiencing pain in her left thumb in late 2020, she did not want to spend $100.00 to go to a doctor to be told she had left trigger thumb when the pain in her left thumb was just like the pain in her right thumb.  (Doc. 7-3, p. 77).

"The ALJ may consider the level or frequency of treatment when evaluating the severity of a claimant's condition," but the ALJ is "specifically prohibit[ed from] drawing any inferences about an individual's symptoms and their functional effects

from a failure to seek or pursue regular medical treatment without first obtaining any explanations that the individual may provide." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267-68 (11th Cir. 2015) (internal quotations and citations omitted). SSR 16-3p provides that the ALJ "will not find an individual's symptoms inconsistent with evidence in the record [for failure to seek medical treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints," including the inability to afford treatment. SSR 16-3p, 2017 WL 5180304, at *9. When the ALJ primarily or exclusively relies on the claimant's failure to seek medical treatment, "but does not consider any good cause explanation for this failure," the Court should remand for further consideration. *Henry*, 802, F.3d at 1268.

For the reasons discussed, substantial evidence does not support the ALJ's and Appeals Council's pain standard findings. On remand, the ALJ must fully develop the record, apply the pain standard based on a more fully developed record, and consider the hypotheticals posed to the VE given the evidence regarding Ms. McIntire's ability to handle with her right, dominant hand.

## CONCLUSION

For the reasons discussed above, the Court remands this case for additional proceedings consistent with this opinion.

**DONE** and **ORDERED** this August 12, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE